Rudolph PRESTON and George E. Graham, Plaintiffs in Error,

v.

The STATE of Oklahoma, Defendant in Error.

No. A–16741.

Court of Criminal Appeals of Oklahoma.

Dec. 14, 1971.

Rehearing Denied Jan. 20, 1972.

R. Michael Cantrell, Oklahoma City, for plaintiffs in error.

Larry Derryberry, Atty. Gen., Fred H. Anderson, Asst. Atty. Gen., Mike Jackson, Legal Intern, for defendant in error.

BUSSEY, Presiding Judge:

Rudolph Preston and George E. Graham, hereinafter referred to as defendant Preston and defendant Graham, were charged, tried, and convicted in the District Court of Oklahoma County, Oklahoma for the offense of Burglary in the Second Degree. Their punishments were fixed at two years imprisonment, and from said judgments and sentences, a timely appeal has been perfected to this Court.

At the trial, Glenda Nees testified that upon returning home at approximately 11:50 a. m., on October 13, 1970, she noticed a black car in her driveway, with the motor running. She entered her garage and observed the back door standing open, and some guns stacked outside the door. She picked up one of the guns and yelled, "What are you doing in there?" Three Negro men ran out of the patio door, and proceeded in a northerly direction. She observed that one of them was wearing a light blue shirt, one was wearing a black shirt and dark trousers, and the third man was wearing a light blue shirt with white stripes. She ran down the street to a neighbor's house and called the police. Upon returning to the residence, she discovered that four guns had been removed from a cabinet in her den, a .41 Colt pistol had been taken from the master bedroom, drawers in a dresser and a cedar chest had been ransacked, coins, $340.00 in currency, and insurance papers were missing. She testified that the defendants fit the description of the persons who ran from her home, but since she did not see their faces, she was unable to identify them. On cross examination, she testified that she knew the exact amount of cash, because her husband had told her on the day of the burglary. She also testified that it could have been possible that she testified differently as to the amount of money at the Preliminary Hearing, because she was nervous and because she had no independent knowledge of how much money was taken since she relied upon what her husband had informed her.

Lieutenant Ruddell testified that he arrived at Mrs. Nees' residence at approximately 12:01 p. m., and that he observed a black Oldsmobile sitting in the driveway with the motor running. After ascertaining from Mrs. Nees the direction in which the intruders fled, he observed three sets of footprints leading off toward a creek behind the house. He testified that he had had the occasion to examine footprints in soil before on approximately 100 occasions, and that he subsequently took State's Exhibit One, a pair of black and white tennis shoes, and State's Exhibit Two, a pair of rough-out shoes, from the defendants at the jail. He returned to the area behind the Nees' house with State's Exhibits One and Two, and compared them to the footprints. He testified that in his opinion the shoes were perfect matches with the fresh footprints. When he first observed the defendants, defendant Graham was wearing a black, tight sweater, and defendant Preston was wearing a light blue sweater with a stripe on it. On cross examination, he testified that he had made casts of the footprints, but that the casting material did not harden properly, and had subsequently crumbled.

Chief Rich testified that he helped investigate the burglary of the Nees' resi-

dence, and that he observed the defendants later that afternoon. Defendant Graham was wearing a black sweat shirt, and defendant Preston was wearing a blue sweater with white stripes. He testified that he received $340.00 in currency from Trooper Shores that afternoon.

Officer Parsons testified that he participated in the burglary investigation at the Nees' residence, and that he followed the footprints from the back of the house, across the creek, and down through the woods for approximately one-quarter mile. He identified a green folder with insurance papers, and a brown folder with car papers, belonging to the Nees, which he found along the trail.

Officer Cobb testified that he was assigned to surveillance approximately one mile east of the Nees residence. He was furnished a description of the suspects, and while stationed at this location, observed three persons crawling through some underbrush. He approached the three persons, identified himself, and asked them to stand up and surrender. The subjects broke and ran away through the woods, wherein the officer fired a warning shot, and one of the subjects, who was wearing a black shirt, fell. The officer approached the subject that had fallen, and the subject jumped up and ran into the woods. The two other persons were wearing a blue shirt and a blue, or grey and white, shirt. He identified the defendants as two of the persons that ran. Officer Cobb subsequently searched the area and found a leatherette packet containing silver coins. He observed the defendants later that afternoon approximately one-quarter mile from where he first saw them in the custody of Trooper Shores and Trooper Green.

Trooper Green testified that he and Trooper Jerry Shores assisted in surrounding the general area where the burglary had occurred. He remained in the patrol unit while Trooper Shores went into the woods. At approximately 2:00 p. m., he observed Trooper Shores come out of the woods with the two defendants. They were advised of their "Miranda rights," and were asked what they were doing in the area, to which they replied that they were bird-watching.

Trooper Shores searched the subjects and discovered a folded roll of bills in the right front pocket of defendant Graham. The bills were subsequently delivered to Chief Rich.

Deputy Johnson testified that he assisted in the surveillance of the area on the day in question. After the defendants were arrested, he searched the general area and discovered a .41 Colt revolver approximately three miles from the place of arrest.

Herman Monson identified pictures of the vehicle which was left at the scene as an automobile which he had given defendant Graham permission to keep for the purpose of either buying, or selling.

For the defense, Glenda Nees was recalled and questioned concerning testimony given at the Preliminary Hearing concerning the amount of money and the description of the persons whom she observed running from her residence.

Bob Beverly testified that he was a certified shorthand reporter for the District Court of Oklahoma County, Oklahoma, and that he had checked through his notes taken at the defendant's Preliminary Hearing concerning Glenda Nees' testimony and he was prepared to testify regarding statements made by Mrs. Nees. On cross examination, it was established that the reporter had skimmed over Mrs. Nees' testimony just to find the point that he was requested to find by the defendant's attorney. He testified that he would need further time to go over the notes again to put everything in the proper context.

■ The first proposition asserts that the court erred in refusing to allow the appropriate impeachment of the State's complaining witness. Defendant argues under this proposition that the trial court prohibited him from impeaching the testimony of Mrs. Nees by refusing to allow the court reporter to testify concerning certain excerpts which he had extracted from his

notes which were taken during the Preliminary examination. The Record reflects that when the court reporter was asked a question concerning Mrs. Nees' prior testimony at the Preliminary Hearing about the amount of money missing, the following transpired:

"MR. SWANSON: Again, Your Honor, the State will not object to her testimony being read into the record if it's all read. We will object to portions.

"THE COURT: Do you desire to read the testimony?

"(The following proceedings were held within the hearing of the jury panel:)

"MR. SCOTT: That's all we have of this witness." (Tr. 117)

We are of the opinion that the trial court did not prohibit the defendant from attempting to impeach the testimony of the witness, Nees, but rather, prohibited defense counsel from questioning the court reporter about certain extracts from his notes out of context. The court reporter testified on cross examination as follows:

"BY MR. SWANSON:

"Q. Bob, how long would it take you to read Mrs. Nees' testimony?

"A. Just off-hand, I would say it would take at least an hour to read it and, since I haven't been over these notes except in various places, I would need time to go over them myself, put everything in context and punctuation and so forth—probably take two hours total." (Tr. 118)

We are of the opinion that the court's ruling allowed the defendants to pursue impeachment in an appropriate manner, which they chose not to do, and thus should not now be allowed to complain on appeal.

■ The second proposition contends that "the court erred in its many rulings on the question of identification and the forced identification of the defendants without benefit of counsel and/or lineup by the only witness to the purported crime was tainted by unfair suggestivity and the defendants, therefore, were never properly identified. [sic]" We do not deem it necessary to fully discuss this proposition, in that the Record reflects that the defendants were not identified in court by the witness, Nees. The witness, Nees, testified that the defendants fit the description of the persons whom she saw run from her house, but she did not see their faces. We, therefore, find this proposition to be without merit.

The next proposition asserts that the trial court erred in refusing to allow the defendants an instruction on identity. We need only to observe that there was no in-court identification of the defendants as the persons the witness Nees observed running from her house. We further observe that the trial court properly instructed the jury on circumstantial evidence.

The next proposition asserts that the trial court erred in making prejudicial remarks in the presence of the jury during the course of the trial. We have carefully examined the entire Record, and find that the defendants' contentions are not supported by the Record. We are of the opinion that the trial court's rulings and remarks did not show favoritism to either the State or the defendants, and further, that the trial court did not indicate any opinion as to the credibility of the witnesses, nor did it relate the court's views on any matters of fact.

■ The next proposition contends that the trial court erred in improperly admitting into evidence a pistol, which was not obtained from the defendants. We need only to observe that the admission of the .41 caliber Colt revolver was proper. The weapon was identified by the witness, Nees, as having been the same gun which was taken from her residence during the burglary. The weapon was found in the area wherein the defendants were arrested, and which was completely surrounded by police officers.

■ The next proposition asserts that the trial court erred in reinstructing the jury orally, and in making certain side-bar comments to the jury and to counsel after

the jury had retired to deliberate and had returned into open court, prior to the verdict. The Record reflects that the jury, after retiring to deliberate, submitted the following question to the court: "Does intent to commit burglary need to be established?" In response to the written question, the court answered:

"THE COURT: I will read you this Section No. Four again: The Statutes of this State provide: Every person who breaks and enters any building or any part of a building, room, booth, tent, railroad car, automobile, truck, trailer, vessel or other structure or erection in which any property is kept or breaks into or forcibly opens any coin operated or vending machine or device with intent to steal any property therein or to commit any felony is guilty of burglary in the second degree.

"That's up to you people to determine whether—what they did—

"MR. CRABB: Your Honor, we are going to object to any side comments. The Court might read the instruction, but anything else we will object to.

"THE COURT: Well, the question has been asked and I'm going to answer it. You can make your record.

"I just call your attention to the breaking and entering necessary to constitute burglary may be any act of physical force, however slight, by which an obstruction to entering is forcibly removed and the opening of a closed door in order to enter a room of a building may constitute a breaking." (Tr. 127–128)

We are of the opinion that the reinstruction of the jury consisted of no more than a reading by the judge of his original instruction, Number Four. In Young v. State, Okl.Cr., 357 P.2d 562 (1960), we stated:

"If oral explanations by the court are made which do not materially alter the written instructions, and which have no tendency to confuse the jury, the verdict should not be disturbed."

We are of the opinion that the trial court should have instructed the jury to re-read the instructions, without comment; however, we are also of the opinion that the court's comments did not prejudice the defendants nor confuse the jury.

In conclusion, we observe that the evidence of defendants' guilt is overwhelming, that the punishment imposed was the minimum provided by law, and under such circumstances, we are of the opinion that the judgment and sentence should be, and the same is, affirmed.

BUSSEY, P. J., and BRETT, J., concur.