THE STATE OF OHIO, APPELLEE, *v.* CARVER, APELLANT.

[Cite as State v. Carver (1972), 30 Ohio St. 2d 280.]

(No. 71-772—Decided June 21, 1972.)

282

*Mr. Everett Burton,* prosecuting attorney, *Mr. Thurl R. Blume* and *Mr. H. Kenyon Watkins,* for appellee.

*Mr. William L. Howland* and *Mr. Charles L. Huddleston, Jr.,* for appellant.

Stern, J. Defendant raises herein ten propositions of law, which we deal with in the order presented.

I.

Defendant contends that the trial court erred in admitting the shorthand notes of the oral statement given by defendant on the morning of September 5, 1969. He argues that defendant had been held incommunicado; that his statement was not voluntarily given; and that his *Miranda* rights were not knowingly and intelligently waived.

The facts surrounding the taking of this statement reveal that defendant, then 18 years of age, had been in police custody from about 1:30 a. m. to 5:30 a. m. He was advised that Samuel had died, and that he was being charged with first degree murder. He was taken to the in-

terrogation room of the Portsmouth Police Department where investigator Williams and secretary Helen Bandy of the prosecuting attorney's office and Detective Bowling of the Portsmouth Police Department were present. The defendant did not request the presence of and was not accompanied by either his parents or an attorney.

A form statement of defendant's rights, in accordance with *Miranda* v. *Arizona* (1966), 384 U. S. 436, was read to defendant. Whether additional explanation was given, or whether defendant read the form is unclear, but the waiver form was signed by defendant.

The statement, taken in shorthand by the secretary, consisted of questions and answers with portions of the questioning being left off the record. At the close of the questioning, defendant signed the shorthand notes without having them read to him. These shorthand notes, and a typed, unsigned copy of the same, were later introduced at the hearing on the motion to suppress, the judge allowing the former and refusing to admit the latter. Defendant did not testify at the hearing on the motion to suppress, nor did he offer any testimony in support of the motion to suppress. At trial, the secretary, over objection, read portions of the statement from her shorthand notes.

We find no support in the record for defendant's argument that he was held incommunicado. Further, the state has affirmatively shown that defendant knowingly and intelligently waived his *Miranda* right not to make the statement (*State* v. *Kassow* [1971], 28 Ohio St. 2d 141). Based upon the evidence adduced at the hearing on the motion to suppress, there is no indication that the statement was involuntarily given.

We hold that the time spent in custody prior to the taking of the statement was not of excessively long duration and was not prejudicial to defendant. Having examined the "totality of the circumstances" (*Gallegos* v. *Colorado* [1961], 370 U. S. 49), we find no prejudicial error in the admission in evidence of the signed shorthand notes.

## II.

The procedure followed by the trial court during *voir dire* was that each prospective juror was initially examined by the court, prosecutor, and defense counsel solely on questions pertaining to capital punishment. Upon establishing that a prospective juror was not subject to being excused because of his belief regarding this matter, additional questions could then be asked at that time. It is defendant's contention that such a procedure leads to the embedding in the minds of the prospective jurors that the sole question with which they will be faced is whether defendant should be put to death or whether the jury should recommend mercy. With this contention we cannot agree.

The nature of any capital case requires that the jury be aware of their responsibility to determine, first, the guilt or innocence of the accused, and, second, in the event of a finding of guilt whether to recommend mercy. In complying with *Witherspoon* v. *Illinois* (1968), 391 U. S. 510, the trial judge made it clear that the issue of capital punishment could become relevant only after a finding of guilt.[1]

We fail to see how such a procedure could have embedded in the minds of prospective jurors that defendant

---

[1] In each instance the court began the questioning of prospective jurors in the following manner:

"* * * the defendant in this case is charged with murder in the first degree. *If the jury should find the defendant guilty,* the punishment is death, unless the jury recommends mercy, in which [event] the punishment is life imprisonment. The death penalty is referred to as capital punishment. Are you opposed to capital punishment?" (Emphasis added.)

If the potential juror responded in the negative, counsel were invited to make inquiry regarding capital punishment. If the response was in the affirmative, the court proceeded with additional questions, the first of which was always substantially as follows:

"* * * *If the evidence convinced you that the defendant is guilty,* could you lay aside that opinion or opposition and with an open mind consider all the penalties provided by law, including the death penalty?" (Emphasis added.)

is guilty and that they will merely be determining the penalty. This procedure not only complies with the requirements of *Witherspoon,* it also expedites the process of *voir dire* examination.

As to defendant's contention that the court failed to use the specific language found in R. C. 2945.25(C),[2] we find no prejudicial error. The language of R. C. 2945.25(C), states a cause for which a juror may be challenged in a capital case. The questions asked in this case were intended to, and did, reveal whether such a cause existed. A reading of the specific language is not required.

Having examined the record of the *voir dire,* we find no error in either the manner in which it was carried out, or in the trial judge's decisions in retaining or excusing particular jurors.

### III.

After the jury had been impanelled and sworn, defendant moved to dismiss the indictment for the reason that the principal had not yet been convicted. This motion was properly denied.

The state does not contend that the fatal stabbing was accomplished by defendant. Rather, the state contends that defendant aided and abetted Paul Dyer in the commission of the offense. R. C. 1.17 specifically provides that such a person "may be prosecuted and punished as if he were the principal offender." Accordingly, he may be indicted and tried before the principal is brought to trial. *Noland* v. *State* (1850), 19 Ohio 131; *Allen* v. *State* (1859), 10 Ohio St. 287; *Brown* v. *State* (1869), 18 Ohio St. 496; *Hartshorn* v. *State* (1876), 29 Ohio St. 635. See *Goins* v. *State* (1889), 46 Ohio St. 457.

---

[2] R C. 2945.25 provides, as follows:

"A person called as a juror on an indictment may be challenged for the following causes:

"* * *

"(C) In the trial of a capital offense, that his opinions preclude him from finding the accused guilty of an offense punishable with death."

## IV.

Defendant's next contention is that the trial court erred in overruling defendant's motion for a directed verdict, made at the close of all the evidence. This motion, predicated upon the belief that the state had failed to prove a purposeful homicide, a corpus delicti, or a robbery, is not supported by the record.

In a trial of an aider and abettor as a principal, it is necessary for the state to establish the elements of the crime charged by prima facie evidence. It is abundantly clear, by the record, that the state met this requirement in the case at hand.[a] Accordingly, the matter became a question of fact for the jury, and defendant's motion for directed verdict was properly overruled.

## V.

Defendant's fifth proposition of law is that "it is error for the trial court to allow evidence to be introduced as to statements made by third parties unless said statements were made in the presence of the defendant * * *."
The testimony referred to is that given by Barbara Bloomfield regarding a conversation she had with Dyer, in the presence of defendant, in Tony's Bar and Grill prior to the robbery.

When asked what Dyer said at that time, the witness, over objection, answered:

---

[a]There was substantial evidence introduced at trial to indicate that prior to leaving the bar defendant knew of the plan to rob Samuel, knew that Samuel supposedly kept money in his left sock, and knew that Dyer was in possession of a knife. Defendant then proceeded to the scene of the robbery with the intent to rob; physically grabbed Samuel and helped jerk him out of the car; and, being aware of the continued fight between Dyer and Samuel, took no action to break it up. During this fight, defendant informed passers-by that everything was okay and left the scene of the robbery with Dyer and proceeded to a second bar where he attempted to establish an alibi. Defendant inquired of the two juveniles how much money had been taken, and volunteered to get rid of the murder weapon. Samuel, having died as a result of the knife wound, was discovered, minus his shoes and left sock.

"Paul [Dyer], whenever they were getting ready to leave, Paul called to me and said, Barb, come here a minute. I walked over to him and he said, tell Brenda I'll be back after awhile, not to worry, there's money involved and for her to stay put. I'll be back."

This testimony was intended to rebut defendant's contention that he had not taken part in the planning of the robbery, and had no knowledge that a robbery had been planned. This contention, moreover, is contradicted by defendant's own statement and his testimony given at trial.

Further, the existence of a conspiracy to rob having been established by other evidence, this extrajudicial statement of a co-conspirator, made in furtherance of the objectives of that conspiracy, is admissible as an exception to the hearsay rule. *Campbell* v. *United States* (1969), 415 F. 2d 356. See *Krulewitch* v. *United States* (1949), 336 U. S. 440; annotation, 93 L. Ed. 802, and cases cited therein. The allowance of this exception to the hearsay rule did not violate defendant's right of confrontation and cross-examination, and the admission of this testimony did not constitute prejudicial error.

## VI.

Defendant next contends that the trial court erred in permitting introduction in evidence of testimony regarding acts which occurred on a day prior to the crime charged. This testimony, admitted as a "similar act" under R. C. 2945.59, primarily consisted of statements made by defendant during his interrogation, which were introduced in evidence by the state during and after cross-examination of defendant at trial.

That testimony was to the effect that defendant and Dyer had robbed a victim on the preceding night and had split the money taken. The act was not remote in time, and was closely related in nature and place to the offense charged, thereby disclosing a motive or purpose for the crime charged. See paragraph one of the syllabus of *State* v. *Moore* (1948), 149 Ohio St. 226.

Defendant's further contention that the trial court

288

failed to properly instruct the jury as to the proper use of this evidence is entirely unsupported by the record and not well taken.[4]

## VII.

Defendant's seventh contention is that the court failed to positively instruct the jury that under the circumstances of this case the defendant had withdrawn from any alleged conspiracy and altercation, and that the court failed to properly respond to the jury's inquiry concerning the law of withdrawal. Neither portion of this contention is supported by the record.

Defendant's statement, which was read into the record, indicates that after Dyer had entered the car from the passenger's side and had begun hitting Samuel, defendant "opened the door on the drivers side. I tried to jerk him [Samuel] out. * * * we finally get him out of the car." After Samuel was out of the car, and while the struggle was continuing, defendant made no effort to stop the fight, but walked toward several stopped cars and told the drivers to go on; that everything was alright. He and Dyer left the scene while Samuel was lying on the sidewalk, and

---

[4]Prior to closing arguments, the court instructed the jury as follows:

"Ladies and gentlemen, the court wants to inform you that during the cross examination of the defendant, certain questions were asked of him which did not bear directly on the offense for which he's being tried today and the court permitted these questions to be asked and him to answer them, merely for the purpose of testing his credibility as in the case of any other witness who takes the stand. You are not to consider these questions and answers to have a direct bearing on the issues in this case but rather as to the weight to be given his testimony. * * *"

Again, during the general charge to the jury, the court stated:
"* * * There is evidence that the defendant may have committed an earlier act similar to that charged in this case. If you find this to be true, such evidence has a limited purpose. You may consider it only to determine the state of mind, intent or purpose of the defendant, if you find from other evidence that the defendant did commit the act with which he is now charged. It must not be considered for any other purpose."

proceeded to Stu Barber's bar, where defendant told a bartender, "if anybody comes in to tell them we had been there."

Defendant's statement also reveals that the two juveniles, who had previously left the scene of the altercation, rejoined defendant and Dyer prior to entering Stu's Bar. At that time, defendant stated that "we asked how much money they got off of him," to which they replied, "a dollar." While proceeding to Stu's Bar, Dyer told defendant that he had "stuck him [Samuel] with a knife," and, inside Stu's Bar, defendant offered to get rid of the knife for Dyer.

This evidence, which is substantiated by witnesses at the scene of the crime; by the testimony of the bartender at Stu's Bar; and by the finding of the knife in the possession of defendant at the time of arrest, falls short of establishing withdrawals as a matter of law. The defendant admits that he took part in the initial confrontation; there was no break in time during the initial confrontation and the stabbing of Samuel; defendant made no effort to assist Samuel or to prevent Dyer from continuing the fight, or to communicate an intention to disassociate himself from the crime; and defendant remained in close proximity to the fight and instructed passers-by that everything was alright.

The issue of withdrawal was properly submitted to the jury, and the trial judge gave proper instructions on that issue. The instructions having been proper, it was within the court's discretion to repeat those instructions when the jury expressed confusion regarding them.

## VIII.

Defendant's eighth contention concerns the general charge given to the jury regarding lesser-included offenses. The court instructed the jury that it could find the defendant guilty of murder in the first degree (R. C. 2901.01), murder in the second degree (R. C. 2901.05), armed robbery (R. C. 2901.13), or robbery (R. C. 2901.12). The defense also requested the court to instruct the jury on the

lesser-included offenses of manslaughter (R. C. 2901.06), attempt to rob (R. C. 2901.24), and assault and battery (R. C. 2901.25). This the court properly refused to do.

Recognizing defendant's right, under R. C. 2945.-74, to have a jury consider a verdict upon a lesser-included offense in lieu of conviction on the principal offense, this court also recognizes that defendant's "liberty should not be dickered away by a compromised verdict upon another crime." *State* v. *Loudermill* (1965), 2 Ohio St. 2d 79, 81. Accordingly, in *State* v. *Nolton* (1969), 19 Ohio St. 2d 133, 135, this court formulated a new rule, stating:

"* * * if the trier could *reasonably* find against the state and for the accused upon one or more of the elements of the crime charged and for the state and against the accused on the remaining elements, which by themselves would sustain a conviction upon a lesser included offense, then a charge on the lesser included offense is both warranted and required, not only for the benefit of the state but for the benefit of the accused."

It follows that no charge as to a lesser-included offense need be given unless, in view of the evidence introduced at trial, there are elements of the principal charge which could *reasonably* be found for the state, and against the defendant, which elements would sustain only a conviction on such lesser-included offense. See R. C. 2945.74 and paragraph 2 of the syllabus of *State* v. *Hreno* (1954), 162 Ohio St. 193.

## IX.

At the conclusion of the court's charge, defense counsel moved that the court give a special instruction pertaining to the subject of accessories after the fact and the acts committed by defendant after the commission of the crime. The court properly charged the jury upon Ohio law relative to aider and abettor, and was under no obligation to give the requested charge.

## X.

Defendant's final assignment of error is that the trial

court permitted the prosecution to introduce argument outside the record which influenced the jury adversely. This error is predicated upon the prosecution's mis-statement in opening argument whereby he attributed a statement made by Dyer to have been made by defendant. This mis-statement, immediately objected to by defendant, was corrected by the prosecutor before proceeding. The jury thus having been apprised of the mistake, we fail to see how it could constitute reversible error.

Defendant contends further that the prosecutor, both in opening and closing arguments, drew improper analogies to other crimes, and stated that "to acquit Mr. Carver is to grant a license to kill—for one dollar." We do not find such conduct to be so flagrant as to prevent a fair trial.

In view of the above disposition of defendant's ten assignments of error, we affirm the judgment of the Court of Appeals.

*Judgment affirmed.*

O'Neill, C. J., Schneider, Herbert, Corrigan and Leach, JJ., concur.

Brown, J., dissents.