324 A.2d 631.

STATE *vs.* ELBERT V. BOWDEN, JR.
DONALD JAMES PICARD.

AUGUST 16, 1974.

PRESENT: Roberts, C. J., Paolino, Joslin, Kelleher and Doris, JJ.

650

JOSLIN, J. Elbert V. Bowden, Jr., and Donald James Picard were jointly tried before a Superior Court justice and jury on indictments charging them with the kidnaping and murder of Dennis Joseph Mulhern. Each defendant was convicted of kidnaping and manslaughter and, following denial of their motions for new trials, both were sentenced to the Adult Correctional Institutions. The cases are now here on their appeals.[1]

At the trial, which took place over more than six weeks, the state's key witness was Richard Rose. As Rose related, he and another member of the East Coast Motorcycle

---

[1]Following the defendants' convictions and the filing of their notices of intention to prosecute bills of exceptions, Rule 4(b) of our rules became effective. It substituted an appeal for a bill of exceptions as the means of securing appellate review of criminal proceedings in the Superior Court. In these circumstances, we treat their notices of intention to prosecute bills of exceptions as notices of appeal. *State* v. *Tella,* 113. R. I. 303, 304 n.1, 321 A.2d 87-88 n.1. (1974).

Federation (ECMF) were in Denny's Tap in Bristol on the evening of July 6, 1970. They had gone there to locate Dennis Joseph Mulhern in order to make him available to members of the Hell's Angels who were coming from Lowell, Massachusetts, to question him about his claimed membership in their motorcycle club. Sometime after 8 o'clock, "Doc" Bergeron, a friend of Rose's, arrived on his motorcycle with Mulhern, known to Rose as "Lucifer," and they joined the other two in the tap. Mulhern was wearing a Hell's Angel patch on his jacket. Soon thereafter, two automobiles pulled into a parking lot across the street from the tap. In Richard ("Moose") Harris' blue Cadillac convertible were Harris and two other ECMF members; in a maroon Ford were three members of the Hell's Angels from Lowell, known to Rose as "Skeets" (Picard), "Spooky" (Bowden), and "Mule." Both defendants had long hair and beards, they were attired in riding clothes and Hell's Angels-type jackets, and "Spooky" had a Hell's Angels emblem tattooed on his forehead. They were joined in the parking lot by those in the bar.

Mulhern was introduced to the three Hell's Angels, who then questioned him in order to ascertain whether he was falsely claiming membership in their club. When he was unable to explain to their satisfaction why he didn't have a Hell's Angels tattoo and why he hadn't contacted anyone in Lowell, Picard and Harris left the group and crossed the street to the tap, where a telephone call was made in a further attempt to learn whether or not he was a member. On their return, Picard told Mulhern that he was not a member of the Hell's Angels. He then struck Mulhern and knocked him down, whereupon the three Hell's Angels started beating, kicking, and stomping him. An ECMF member then "* * * asked permission of the Angels if he could get a piece of the action." Permission was granted, and the ECMF members joined in the beating.

When a neighbor apparently noticed what was happening, Picard said, "We can't leave him here, take him with us." Thereupon, Mulhern, alive but bleeding profusely, was placed in the back seat of the Cadillac. Picard, Bowden, and "Mule" then left in the Ford, followed by Mulhern, Harris, and the two others in the Cadillac, and by "Doc" Bergeron and Rose on their motorcycles. Both Rose and another witness observed that some of the three persons in the Cadillac made "punching motions" where Mulhern was sitting, but did not see where the blows were landing. En route to Providence, Bowden stopped the Ford and talked to Rose, who returned with "Doc" to the parking lot to search for certain missing items. When this mission was accomplished, Rose and "Doc" proceeded to the ECMF clubhouse on Eddy Street in Providence, but defendants were not there when they arrived, nor did Rose see them in Providence that night.

About four days later, a body was found floating in the Providence River. Although by then it appeared to be one of a much older and heavier person, the body was identified as Mulhern's. Medical examination showed that death was due to blunt forces applied to various parts of the body and not to drowning.

The defendants argue eleven issues, which for convenience may be grouped into three categories: (1) comments by the prosecutor which defendants assert required the trial justice to pass the cases, (2) rulings permitting the introduction of evidence whose potential for prejudicing and inflaming the jurors allegedly outweighed its probative force, and (3) miscellaneous matters consisting of evidentiary rulings, instructions to the jury, and a denial of their motions for directed verdicts.

### The Motions to Pass

The defendants argue that the prosecutor in some of his comments to the jury went beyond the limits of his

assigned role and became a heated partisan more interested in obtaining convictions than in seeing that justice was done; that those comments so exceeded permissible bounds that they could not be cured by cautionary instructions; and that in those circumstances it was error for the trial justice not to grant their resulting motions to pass the cases.

Whether there is any merit to those contentions depends upon whether the allegedly offensive remarks were so flagrantly impermissible that even the cautionary instructions which were given were insufficient to assure defendants the fair and impartial trial which was their due. *State v. Costa,* 111 R. I. 602, 306 A.2d 36 (1973); *State v. Kozukonis,* 100 R. I. 298, 303, 214 A.2d 893, 897 (1965). No precise formula is available for making that determination. What is required instead is that each of the challenged comments be viewed in the context in which it appears and in the light of the attendant circumstances. *State v. Peters,* 82 R. I. 292, 296, 107 A.2d 428, 430 (1954).

The first of those comments occurred during the prosecutor's opening statement, when he several times said to the jury, "You will learn" and then referred to the matters he intended to prove.[2] While defendants agree that these statements would have been within permissible bounds had the verb "hear" been substituted for "learn," they argue that the use of the latter carried with it the connotation that the facts had already been proved, and that the prosecutor's opening, instead of serving to prepare the jurors' minds for the evidence to be presented, conveyed the impression that he believed defendants were guilty.

In our judgment, defendants pick at semantic straws

---

[2] An example of that kind of statement is:

"You will learn also, Mr. Foreman and ladies and gentlemen, that Mulhern was placed in one of those automobiles and transported to Providence and was beaten at least part of the way back."

when they argue in this manner. One need not be a lexicographer to comprehend that the prosecutor, in effect, used the word "learn" as a synonym for the word "hear," which even defendants agree would have been a permissible substitute. Moreover, an expression by a prosecutor of his belief in defendants' guilt is not improper so long as it appears that the belief is premised upon evidence to be presented, rather than upon knowledge of facts which will not be offered as evidence. *State* v. *Kozukonis, supra* at 304, 214 A.2d at 897. And there is no representation in these cases that the facts which the prosecutor told the jury they would "learn" would not be offered as evidence.

Further motions to pass the cases were made when the prosecutor included in his opening statement a reading of the indictments, which referred to each defendant as "alias, John Doe." While defendants argue that this was reason for passing the cases, they do not indicate either by argument, analysis, or citation of authority how those references contributed to their convictions. That omission would ordinarily be fatal to their claim. *State* v. *Carufel,* 106 R. I. 739, 742, 263 A.2d 686, 687-88 (1970). In addition, we are unable to perceive how advising the jury of the presence of aliases in the indictments was prejudicial, particularly inasmuch as defendants and most of the other participants in these offenses were known by such aliases as "Skeets," "Spooky," "Mule," "Moose," and the like. In a comparable situation, the Supreme Judicial Court of Massachusetts held that absent a request for a limiting instruction, it was not error to read to the jury an indictment containing ten aliases, only one of which was subsequently proved. *Commonwealth* v. *Torrealba,* 316 Mass. 24, 25-26, 54 N.E.2d 939, 940-41 (1944). Nothing in the facts of these cases persuades us that we should hold otherwise.

Finally, there is the prosecutor's closing argument, dur-

ing which he made allegedly abusive remarks concerning defendants and their attorneys. These remarks came at the end of a long and heated trial marked by frequent clashes between counsel and repeated admonitions by the trial justice. The defendants, nevertheless, claim that the prosecutor's remarks were totally extraneous to the issues in the cases, tended to inflame and arouse the passions of the jury against them, and hence were cause for passing the cases under the rule announced in *State* v. *Mancini*, 108 R. I. 261, 273-74, 274 A.2d 742, 748 (1971), and *State* v. *Werner*, 87 R. I. 314, 318, 140 A.2d 502, 504 (1958).

Two of the four comments upon which defendants grounded their motions to pass, when viewed contextually, relate directly to Rose's credibility. One of those comments was merely the prosecutor's explanation of why he did not offer to introduce into evidence a sworn statement which Rose made shortly after the murder.[3] While the language used in that explanation perhaps was not as restrained as it might have been, who can say that the prosecutor's assessment of how defense counsel would have reacted is unrealistic? Certainly, what was said does not fairly imply that defense counsel hindered the production of evidence. Moreover, any possible undue prejudice arising from the comment was cured when, on the following day, the trial justice told the jury that the comment was inappropriate and should be disregarded.

The other of those comments was the prosecutor's response to defense counsel's argument that Rose should not be believed because he testified to a change of drivers in the Cadillac while it was going 45 to 50 miles an hour. In pointing out that such a change was more likely to be made by "motorcycle nuts" than by another class of op-

---

[3] "He [defense counsel] makes issue out of the fact why didn't the State introduce this exhibit; because if I had even attempted to, he would have jumped up through the ceiling."

erators,[4] the prosecutor was merely expressing an opinion which the jury might also reach on the admitted facts in the cases. In those circumstances, defendants have no just cause for complaint. *State* v. *Plante,* 111 R. I. 386, 302 A.2d 804 (1973).

The defendants also argue that the cases should have been passed because during his summation to the jury the prosecutor stated that "These guys have broken the code" and that their counsel "planned trickery and deceit." The difficulty we have in giving any weight to these contentions is that they are unaccompanied by either a transcript of the prosecutor's closing argument or any argument from counsel advising us of the context in which the offending remarks were made. Without that knowledge, it is impossible for us to determine whether the comments were unrelated to the evidence or totally extraneous to the issues in the cases and therefore objectionable. *State* v. *Plante, supra; State* v. *Mancini, supra.*

## *Prejudicial Rulings*

The arguments in this grouping focus on the rule that otherwise relevant evidence should not be considered by a jury if its probative value is clearly outweighed by a likelihood of undue prejudice. *State* v. *Reardon,* 101 R. I. 18, 24-26, 219 A.2d 767, 771-72 (1966). To determine whether the evidence in a given case has that effect requires an examination of its substance and the facts attendant upon its admission, and an evaluation of its probable influence upon the outcome of the case. *Heuser* v. *Goldstein,* 107 R. I. 317, 321-22, 267 A.2d 420, 422-23 (1970).

The defendants contend that under these principles it was error to admit photographs depicting the victim's

---

[4]"We are not dealing with people that belong to AAA. We are dealing with motorcycle nuts. They will do anything."

corpse. But this court has long held that a photograph of a murder victim is admissible so long as it is competent evidence which reasonably tends to prove or disprove some material fact in issue, provided it is not offered for the sole purpose of arousing the passions of the jury. If these conditions are satisfied, it is of no concern that a photograph may be unpleasant to view or that it may have an influence beyond the strict limits of the purpose for which it was introduced. State v. Danahey, 108 R. I. 291, 300-01, 274 A.2d 736, 741 (1971); State v. Winston, 105 R. I. 447, 450-51, 252 A.2d 354, 356-57 (1969).

Here, during several days' immersion in the river, the victim's features had become distorted and his appearance altered. The photographs which were admitted as exhibits, while gruesome, assisted in establishing the corpse as Mulhern's. In the circumstances, the admission of the photographs was not an abuse of discretion.

Another assignment of error is to admitting as exhibits a blood-stained automobile seat and a floor mat taken from the Cadillac in which Mulhern was allegedly transported from Bristol to Providence. The defendants argue that such admissions opened the door to jury speculation of a possible connection between the exhibits and the victim's death. This result, they continue, created a potential for prejudice which outweighed whatever slight probative force the exhibits had. We cannot agree. The witness Rose did, after all, testify that he had attempted to remove all traces of blood from the seat of the Cadillac in which the victim, while bleeding, had been transported to Providence. While one expert was unable to say whether the blood traces found on the seat were the victim's, another testified that there was a "high degree of probability" that hairs found on the floor mat were the decedent's. It seems to us, therefore, that while their probative value may not have been substantial, the exhibits

furnished a link in the chain of circumstances tying defendants to the crime. That was a sufficient basis for admission, absent some more convincing showing than defendants have made that the exhibits could have had a prejudicial effect upon the jury.

Finally, defendant Bowden argues that his case should have been passed because of the passion and prejudice engendered in the minds of the jury when, at the state's request, he was required to bare his forehead. That request was made for the purpose of verifying a witness' prior testimony that he had seen a tattoo of the Hell's Angels emblem on Bowden's forehead. Bowden does not suggest that the asserted error rises to constitutional proportions. *Schmerber* v. *California*, 384 U. S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), clearly forecloses that assertion. What he does argue, however, is that the state's demand was merely a ploy to divert the jury from a fair consideration of the issues and that the prejudice resulting from the compelled display clearly offset whatever minimal. relevance the tattoo's presence might have had in substantiating the witness' identification of him as one involved in the commission of the crimes.

That argument, it seems to us, extends the *Reardon* rule well beyond its outer limits by seeking to exclude competent evidence which has a natural tendency to establish the facts in controversy merely because it might arouse feelings of indignation in the jury. The court in *Reardon* clearly rejected that extension in quoting from *Darling* v. *Charleston Community Memorial Hosp.*, 50 Ill. App.2d 253, 321, 200 N.E.2d 149, 183 (1964), *aff'd*, 33 Ill.2d 326, 211 N.E.2d 253 (1965), *cert. denied*, 383 U. S. 946, 86 S.Ct. 1204, 16 L.Ed.2d 209 (1966):

" 'Evidence having a natural tendency to establish the facts in controversy should be admitted; competent evidence may not be excluded merely because it might

arouse feelings of horror or indignation in the jury; questions as to the character of the evidence offered, and the manner and extent of its presentation, are largely within the discretion of the Trial Court, and the exercise of that discretion will not be interfered with unless there has been an abuse to the prejudice of the defendant * * *.'" *State* v. *Reardon, supra* at 25, 219 A.2d at 771-72.

We find no such abuse in this case.

## Miscellaneous Arguments

Initially defendants contend that the trial justice unduly restricted their attempts to impeach Richard Rose, the state's primary witness, with evidence of prior inconsistent statements allegedly made during conversations with one Vito Russo, a fellow inmate at the Adult Correctional Institutions and a "jailhouse lawyer." Rose was questioned by defendants during cross-examination about those conversations, and later they called Russo as their witness. While Russo was permitted during his direct examination to relate generally what Rose had told him about the offenses, the trial justice would not permit Rose to be quoted directly. That, he said, would provide the jury with "a hearsay version of how this offense was committed," and tend to confuse it. In addition, he barred inquiry into certain areas of the alleged conversations on the ground that defendant had not laid the prerequisite foundations.

Notwithstanding those restrictions, an examination of Russo's testimony reveals that the jury was advised, albeit in general terms, of numerous inconsistencies between Rose's at-trial testimony and what he had previously related to Russo. The jury was also specifically informed that Rose had told Russo that Bowden had not been involved in the killing, that the price Rose had exacted for agreeing to testify for the state was the drop-

ping of a kidnaping charge against his friend, "Doc" Bergeron, and that the state had promised him his freedom if he involved the Hell's Angels in Mulhern's death.

The law with respect to the use of prior inconsistent statements for impeachment is settled and may be briefly stated. It provided a vehicle for discrediting Rose's testimony, which directly involved these defendants in the offenses charged, and it made possible the introduction of pretrial statements made by him which, if offered as credible testimonial assertions, would have been rejected as obnoxious to the hearsay rule. *Allen* v. *D'Ercole Constr. Co.,* 104 R. I. 362, 369-70, 244 A.2d 864, 869 (1968); *State* v. *Merola,* 80 R. I. 176, 179, 94 A.2d 426, 427-28 (1953). However, to avoid surprise and to provide Rose ample warning of contradictory statements to be offered against him so that he might have full opportunity either to explain them away or to disprove them, it was necessary that Rose's attention first be directed to the supposed statements and when, where and to whom they were made. *State* v. *Vaccaro,* 111 R. I. 59, 64-65, 298 A.2d 788, 791 (1973); *see also* G. L. 1956 (1969 Reenactment) §9-17-14. Indeed, Rose could have been recalled, if necessary, in order that such a foundation might properly be prepared. *State* v. *Belu,* 141 A. 917, 918 (R. I. 1928). Whether that foundation was established was a matter for the trial justice's sound judicial discretion. *See Morgan* v. *Washington Trust Co.,* 105 R. I. 13, 26-27, 249 A.2d 48, 55-56 (1969). Had it been established, the allegedly contradictory statements would have been admissible, not for their substantive or independent testimonial value, but only to impeach or to neutralize the at-trial testimony. *State* v. *Harris,* 106 R. I. 643, 647-48, 262 A.2d 374, 376-77 (1970); *Allen* v. *D'Ercole Constr. Co., supra; see State* v. *Quattrocchi,* 103 R. I. 115, 123-24, 235 A.2d 99, 104 (1967).

The question that remains is whether these general principles were misapplied in these cases. That question is clouded by defendants' failure to specify what questions Russo was not allowed to answer or what foundations were laid for those questions. Even were we to ignore that failure and explore the record in order to ascertain what those questions were and whether proper foundations had been laid for them, we would still not be in a position to pass on defendants' contentions. This is so because defendants in their brief do not tell us where in the record we can find offers of proof which in reasonably specific terms would now provide us with a clear picture of what it was they intended to prove. This they should have done. *Enos* v. *W. T. Grant Co.*, 110 R. I. 523, 531, 294 A.2d 201, 205 (1972); *Manning* v. *Redevelopment Agency*, 103 R. I. 371, 378-80, 238 A.2d 378, 382-83 (1968). Without such an offering we obviously are not in a position to determine whether the excluded evidence would have so added to the effect and the weight of the already admitted impeaching testimony that it might reasonably have altered the result of these cases and have caused the jury to return not guilty verdicts. *State* v. *Almeida*, 111 R. I. 566, 570, 304 A.2d 895, 897-98 (1973).

We agree with defendants that the trial justice misconceived the thrust of the principles permitting the use of evidence of prior inconsistent statements for impeachment when he ruled that Russo could not quote Rose, and limited him to contradicting only what Rose had testified he said to Russo about the crimes and then only in general terms. But the mere possibility that the ruling was erroneous will not call for a reversal unless it can reasonably be said that a contrary ruling would have produced a different outcome in the cases. *State* v. *Almeida, supra.* The defendants have failed to establish that this result would follow.

Another assignment of error is to the rulings permitting Rose to testify (1) that Picard, in Bowden's absence, told him "that he would get me [Rose] and my whole family" if he testified to the contents of a statement he had given the police, and (2) that Bowden, in Picard's absence, told him that "* * * he was trying to recall different dates where he had been so he would be able to establish an alibi for July the 6th."

Before us, defendants argue that these extrajudicial utterances were not admissions, were not relevant to the issues because of remoteness, and, although not articulated in so many words, were therefore inadmissible as hearsay. Their failure to support that argument either in their brief or in oral argument with any analysis, discussion, or citation of authority is sufficient ground for its rejection. *State* v. *Carufel*, 106 R. I. 739, 742, 263 A.2d 686, 687-88 (1970). Beyond that, however, there can be no serious question that on the record each of those statements was voluntarily made; that although not amounting to confessions, they were evidence which, when considered together with other evidence and the surrounding circumstances, yielded to inferences of guilt; and that they therefore were not barred by the hearsay rule. *State* v. *Turcotte*, 68 R. I. 119, 122, 26 A.2d 625, 627 (1942); *State* v. *Durkee*, 68 R. I. 73, 77, 26 A.2d 604, 607 (1942); *State* v. *Mariano*, 37 R. I. 168, 182-83, 91 A. 21, 27 (1914).

The defendants further contend that despite the trial justice's cautionary instructions to the contrary, the statements created a substantial risk that the jury might look to each statement as incriminatory not only of its maker, but of the codefendant as well. In those circumstances, they argue, their request for a severance should have been granted under the rule announced in *Bruton* v. *United States*, 391 U. S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). The short answer to that contention is that Bowden's

statement did not implicate Picard, and Picard's did not implicate Bowden. That being so, there was no reason for the rule in *Bruton* to be applied. *State* v. *Patriarca,* 112 R. I. 14, 43, 308 A.2d 300, 317 (1973).

The remaining four contentions advanced by defendants as grounds for reversal may be summarily rejected. The first of these is defendants' assertion that it was error to deny their motions for directed verdicts on all indictments. The defendants made those motions at the conclusion of the state's case without having first rested their cases, and under the practice then in effect in this state, exceptions did not lie to those rulings. *State* v. *Colavecchio,* 111 R. I. 428, 431-32, 303 A.2d 760, 762 (1973); *State* v. *Kozukonis,* 71 R. I. 456, 460-61, 46 A.2d 865, 867-68 (1946).

A second argument concerns the testimony of a Registry of Motor Vehicles inspector who was called as a defense witness. During direct examination, he testified that the registry records indicated that the blue Cadillac convertible, in which the victim had allegedly been transported from Bristol to Providence, belonged to one William Jones, rather than to Harris as claimed by the state. When later during cross-examination the prosecutor asked whether defendants had subpoenaed the registry records of Harris, the defendants objected and moved to pass the cases.

They cite *Griffin* v. *California,* 380 U. S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), as authority for their contention that it was error to deny that motion. In that case the court held that the fifth amendment, as made obligatory upon the states by the fourteenth amendment, "* * * forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Id.* at 615, 85 S.Ct. at 1233, 14 L.Ed.2d at 110. That holding is obviously unrelated to

defendants' contention that the cases should have been passed because of the question asked the registry inspector, and it may be rejected without further discussion.

Next is the defendants' contention that it was error not to have instructed the jury that in determining guilt or innocence, they had to find that all of the facts and circumstances necessary to prove the crime charged had been established beyond a reasonable doubt, and that taken together those facts and circumstances were consistent with the inference of defendants' guilt and at the same time were inconsistent with any reasonable hypothesis of their innocence.[5]

Assuming that the evidence in these cases was such as to make that instruction appropriate, and assuming also that its substance was not included in what the jury was told by the trial justice, defendants have not pointed to where in the record they either asked for that instruction or objected to the trial justice's failure so to charge. That omission precludes them from assigning the trial justice's asserted failure to do so as error. *State* v. *Carraturo*, 112 R. I. 179, 191, 308 A.2d 828, 834 (1973); *State* v. *Amado*, 109 R. I. 53, 58, 280 A.2d 324, 327 (1971); *Geary* v. *Hoffman*, 98 R. I. 413, 418, 204 A.2d 302, 306 (1964); *Bernat* v. *DeGasparre*, 85 R. I. 259, 262, 129 A.2d 545, 546 (1957).

Clearly without merit is the defendants' final contention that the trial justice erred when he honored two requests from the jury to repeat that portion of his charge wherein he defined murder and its various degrees. *United States* v. *Middlebrooks*, 431 F.2d 299, 301 (5th Cir. 1970), *cert. denied*, 400 U. S. 1009, 91 S.Ct. 569, 27 L.Ed.2d 622

---

[5]Such an instruction is required when the evidence is entirely circumstantial. *State* v. *Fortes*, 110 R. I. 406, 293 A.2d 506 (1972); *State* v. *Montella*, 88 R. I. 469, 476, 149 A.2d 919, 922-23 (1959); *State* v. *Di Noi*, 59 R. I. 348, 368, 195 A. 497, 506 (1937); *see State* v. *Rose*, 112 R. I. 402, 406, 311 A.2d 281, 283-84 (1973).

(1971); *People* v. *Schader,* 71 Cal.2d 761, 781, 457 P.2d 841, 853-54, 80 Cal. Rptr. 1, 13-14 (1969); *State* v. *Di Dolce,* 109 N.J.L. 233, 237, 160 A. 516, 517-18 (E. & A. 1932); *State* v. *Carver,* 30 Ohio St.2d 280, 289, 285 N.E. 2d 26, 33, *cert. denied,* 409 U. S. 1044, 93 S.Ct. 542, 34 L.Ed.2d 495 (1972); *Preston* v. *State,* 492 P.2d 376, 379-80 (Okla. Crim. App. 1971).

The defendants' appeals are denied and dismissed, the judgments appealed from are sustained, and the cases are remitted to the Superior Court for further proceedings.

*Richard J. Israel,* Attorney General, *Donald P. Ryan,* Asst. Attorney General, *Edward E. Dillon, Jr.,* Special Asst. Attorney General, for plaintiff.

*John F. Cicilline, Alfred Paul Farese,* Everett, Massachusetts, for defendants.