## Commonwealth *v.* Capalla, Appellant.

Argued April 13, 1936. Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*Adam B. Shaffer,* with him *Robert J. Schwerha* and *Harold L. Rothman,* for appellant.

*John F. Haggerty,* Assistant District Attorney, with him *Andrew T. Park,* District Attorney, for appellee.

OPINION BY MR. JUSTICE MAXEY, May 25, 1936:

The defendant was tried on an indictment charging him with the murder of one John Festa. The defense was self-defense. The jury returned a verdict of voluntary manslaughter. Defendant was sentenced to pay a small fine and to undergo imprisonment from three to six years in the Western Penitentiary. A new trial was asked for and refused. Defendant appealed.

On May 24, 1935, defendant was attending to his confectionery store in the City of Pittsburgh. According to defendant's testimony, the deceased on the day in question entered defendant's store, called him vile names, and invited him outside to fight. Defendant asked the deceased to leave and then ejected him. This happened three or four times at short intervals. Just prior to 2 p. m. three customers came to defendant's store and went into the back room to smoke. About 2 p. m., the deceased with two companions entered the store and deceased said to defendant: "We will get you and wreck the place." Defendant answered: "Please don't do that. Go away from here." One Larkin who was with the deceased was inciting the latter and another man to kick the defendant in the groin. Defendant said that Larkin "pushed the other two on the top of me and all three were on top of me." The store was about four and one-half feet wide and eleven feet long. Defendant testified that these men jumped on him and tore his clothing. He said that "everything was broken. Everything was all over the floor." He said that he was in "serious condition when [he] pulled the gun," that he got the gun to

protect himself when Festo came to insult him that day for the third time, and that he had the gun for a year, back of a cracker box on the shelf.

John Latsko, a witness called on behalf of the defendant and one of three men in the back room of the store on the afternoon in question, testified that he heard the deceased cursing defendant and calling him vile names. He said that the deceased and another man "rushed Capalla and pushed him against the ice box." Another of the assailants picked up a bowl of candy and threw it at the defendant and hit him in the back. Then the witness went back into the kitchen and shortly afterwards heard two shots. He said that when he last saw the defendant, the latter was against the ice box and "two men were at him and this one threw the bowl of candy at him."

Another one of the three customers who were in the back room, testified that the defendant asked the deceased to get out of the store and the latter answered, "Try to make me." The deceased called the defendant vile names. Another of these men testified that he was present when the defendant asked the deceased to get out of his place of business.; He said that finally the fellow did get out. He asked defendant: "What is the matter?" and the latter answered: "They have been bothering me all day." He testified further: "While we were sitting down in the kitchen I heard a commotion in the front end of the store and I heard a big noise and one fellow says, 'Now, get him. We will back you up here.' He says, 'Kick that fellow. Wreck him. We are absolutely going to wreck this place.'" The witness said that he got up, looked through the curtain and saw a man by the name of Malarky [Larkin] standing in the doorway enticing these other two boys to fight. Larkin then picked up some kind of a jar and "swung it toward the back end at defendant." He testified that "they were kicking around and shuffling." The witness said to his friends: "We are in an awful jam here." They went out the back door. He heard shots fired.

Larkin (sometimes referred to as Malarky), who apparently had much to do with fomenting this trouble, testified on behalf of the Commonwealth that he entered defendant's store with the deceased on the afternoon in question and that defendant started arguing with the deceased about money the latter owed to him. He said that the deceased called the defendant a vile name and asked him to go outside to fight, and that the defendant then "ran to the ice cream freezer and grabbed the club." Defendant tried to strike Festo but hit the witness instead and the latter fell. The witness was asked: "After he hit you with the club, what happened? A. After that I must have fell on the floor and I must have got shot then." Witness denied that he picked up the peanut machine or anything else or that he threw it at anybody. He walked out of the store and saw the defendant with a gun. The witness did not then see Festo. After the witness got out of the store, he fell, and he and Festo were taken to the hospital, where Festo died. He said he heard but one shot. He did not know where defendant got the gun.

There are three assignments of error. The jury might well have found that the evidence fell short of proving defendant's guilt beyond a reasonable doubt, but that was for the jury's determination. The only matters we need consider are the alleged errors in the trial. The second assignment of error is based on the court overruling defendant's objection to the district attorney's closing speech, as follows: "If the court please, I want to put on the record, the statement that the district attorney had made when he said 'there is no reason ever for shedding human blood except in war.' " After overruling this objection, the trial judge said: "We think the argument of the district attorney is deducible from the evidence in this case, and the question of what the evidence is, is a question for the jury to determine as we will instruct them in our general charge." The statement, "there is no reason for shedding human blood ex-

cept in war" was wholly unwarranted. It is well settled that to kill another, if it is necessary to do so in order to protect one's life or limb, or to save one's self from great bodily harm, or under circumstances reasonably giving rise to fear of such injuries unless one kills one's assailant, is justifiable homicide. (See *Abernethy v. Com.*, 101 Pa. 322; *Tiffany v. Com.*, 121 Pa. 165, 15 A. 462, and *Wharton's Criminal Evidence*, 10th ed., volume 1, section 69, page 252.)

In the instant case there was a clearly defined issue of self-defense and it cannot be held that the statement of the district attorney, which when called to the court's attention was apparently acquiesced in by the latter, does not amount to reversible error. A statement of that kind the jurors are quite likely to recall, in their deliberations, more vividly than they recall the formal correct expressions in the judge's charge. Such a statement, when not properly taken care of by the court, can be highly prejudicial to a man on trial for his life or liberty. The second assignment is sustained.

The third assignment of error is based on the court's overruling defendant's objection to the district attorney's closing speech. This episode appears on the record as follows: "He [the district attorney] pointed to the defendant and called him 'a cold-blooded killer' and I ask, for that reason, that a juror be withdrawn." The motion was overruled. This assignment of error is sustained.

It is no part of a district attorney's duty, and it is not his right, to stigmatize a defendant. He has a right to *argue* that *the evidence* proves the defendant guilty as charged in the indictment, but for the *district attorney himself* to *characterize* the defendant as "a cold-blooded killer" is something quite different. No man on trial for murder can be officially characterized as a murderer or as "a cold-blooded killer," until he is adjudged guilty of murder or pleads guilty to that charge. This court stated in *Com. v. Nicely*, 130 Pa. 261,

270, 18 A. 737: "The district attorney is a quasi judicial officer. . . . He should present the Commonwealth's case fairly, and should not press upon the jury any deductions from the evidence that are not legitimate. When he exceeds this limit, and appeals to their prejudices, he is no longer an impartial officer, but becomes a heated partisan." In *Com. v. Bubnis,* 197 Pa. 542, 550, 47 A. 748, this court said: "In his official capacity, clothed with the gravest responsibilities and exercising functions in a measure judicial, the district attorney should ever be cautious in expressing to a jury his belief in the guilt of the accused. If convinced of it, his duty is to lead them to his own judgment by pointing out to them, intelligently and impartially, the evidence which cannot fairly justify any other conclusion." In *Com. v. Swartz,* 37 Pa. Superior Ct. 507, that court held that where a district attorney in cross-examining a witness, after the witness had answered a question, said, "That is a lie," and opposing counsel made objection, the court should have granted the request that a juror be withdrawn and the case continued. In *Com. v. Ronello,* 251 Pa. 329, 96 A. 826, the district attorney stated, "I am honestly convinced that he [the defendant] did that dastardly deed." This court, in an opinion by Mr. Justice STEWART, characterized the district attorney's remarks as "wholly inexcusable and so violative of the prisoner's right to a fair trial on the evidence submitted and that alone," and said that "the cautioning of the jurors by the trial judge to disregard the district attorney's remarks was wholly inadequate to the protection of the defendant's rights," and "could give no assurance that the prejudice otherwise certain to result to the defendant had been averted."

There is very slight, if any, difference in the character of the statement condemned by this court in the last mentioned case and the statement complained of in *this* case, to wit, that the defendant was "a cold-blooded killer." This latter statement was equivalent to an ex-

pression of belief on the part of the district attorney that the defendant was guilty of murder in the first degree. There are no facts in the record warranting any such belief on the part of anyone, and even if there were, the first officials who had the right to give expression to that belief were the jurors after the case was committed to their keeping. The application of epithets to a defendant on trial, and expressions of personal belief in a defendant's guilt have no legitimate place in a district attorney's argument. A closing argument can be strong and convincing without them. They are not found in those models of court room prosecuting addresses which have come down to us from the great lawyers of earlier generations.*

The due administration of justice requires that every public official in the discharge of his duties keep within the orbit legally assigned him.

The judgment is reversed and a venire facias de novo is awarded.

---

* All prosecuting attorneys would do well to study as a model the justly-renowned address of Daniel Webster in the case of *Commonwealth of Massachusetts v. John F. Knapp* for the murder of Captain Joseph White. No more powerful and convincing address in a criminal trial is to be found in any language, and yet nowhere during the course of his closing argument for the Commonwealth did Webster apply any epithets to the defendant or express any opinion as to his guilt or innocence. At the outset of his address he made it clear that as the Commonwealth's attorney he "would not attempt to hurry the jury against the law or beyond the evidence." After a vivid and moving word picture of the killing of the victim as he slept, "the beams of the moon resting on the gray locks of his aged temple," Webster made a clear and complete analysis of the testimony and showed how it logically pointed to the guilt of the accused. In almost his final paragraph he said, "Toward him [i. e., the defendant], as an individual, the law inculcates no hostility, but toward him, if proved to be a murderer, the oaths you have taken and public justice demand you do your duty." It should be noted that Webster did not characterize the defendant as a murderer or as "a cold-blooded killer." Instead of that he impressed upon the members of the jury that they should do their duty *"if"* the defendant on trial *"proved to be a murderer."*