417 A.2d 181

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Daniel BROWN, Appellant.**

Supreme Court of Pennsylvania.

Submitted April 21, 1980.

Decided July 3, 1980.

John Paul Curran, Philadelphia, for appellant.

Robert B. Lawler, Asst. Dist. Atty., Chief, Appeals Division, Victor M. Fortuno, Philadelphia, for appellee.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, NIX, LARSEN, FLAHERTY and KAUFFMAN, JJ.

OPINION

KAUFFMAN, Justice.

After a 1977 jury trial in Philadelphia, appellant, Daniel Brown, was convicted of murder of the third degree and

possession of an instrument of crime. Appellant's post-verdict motions were denied, and he filed this appeal.[1] We affirm.

The trial evidence discloses that on the evening of July 8, 1977, appellant's sister, Trudy Brown, and a neighbor, Veronica Jackson, became involved in a violent argument, causing a crowd to gather in front of appellant's home. A policewoman arrived, and the fight was broken up with the help of neighbors. Ms. Brown was forcibly removed to her home, screaming. Within minutes Ms. Brown ran from the house brandishing a knife and stabbed Veronica Jackson's mother, Mrs. Rebecca Jackson, as she sat with friends on a stoop directly across the street from appellant's home. Once again, the police arrived, and Ms. Brown was again forcibly removed to her home where she continued screaming and "acting like a wild woman."

Shortly thereafter, appellant told the police to leave since, in his view, the situation had calmed sufficiently. After the police departed, appellant's friend, James Hayes, arrived. Hayes warned that if the Jacksons' dispute with the Browns could not be settled, they would "shoot it out." Hayes then entered the appellant's home with the briefcase which he had been carrying. Immediately thereafter, appellant ran from the house and fired four shots from a .38 caliber revolver into the nearby crowd. Two of the bullets struck nineteen year old Sharon Sampson in the back and killed her.

The Commonwealth sought to prove at trial that appellant told the police to leave so that he could carry out his plan to shoot the Jacksons and their neighbors as they stood on the stoop and street in front of his home. Two of the shots fired into the crowd struck the decedent instead.

The defense contended that the crowd outside appellant's home had grown violent, and that after several visits, the police refused protection for the Brown family. Thus, ap-

1. Jurisdiction is vested in this Court by the Judicial Code, Act of July 9, 1976, P.L. 586, No. 142, § 2, *as amended*, 42 Pa.C.S.A. § 722(1) (Pamph. 1979).

pellant, in an effort to protect his home and family, shot over the crowd and accidentally hit decedent.

## I.

Appellant first contends that he was prejudiced by prosecutorial misconduct. We disagree.

■ Appellant argues that the Commonwealth presented materially different versions of the Sampson shooting at the suppression hearing and at trial. Since this claim was not raised at trial, it has been waived. *Commonwealth v. Clair*, 458 Pa. 418, 326 A.2d 272 (1974).

■ Appellant next asserts that the prosecutor concealed the discovery of three spent .25 caliber casings near the scene of the shooting. He argues that this evidence would have corroborated his testimony that he shot over the crowd only after he had heard shots fired at his home. The record, however, reveals no such concealment. Quite to the contrary, the discovery of the cartridges was disclosed to appellant both before and during trial.

■ Appellant further claims that he was prejudiced when the prosecutor briefly cross-examined his sister, Trudy Brown, regarding her use of drugs on the night of the shooting. A police officer testified that Ms. Brown appeared to have been drinking that night. Moreover, on cross-examination, Ms. Brown admitted that she had been drinking earlier in the evening. Several witnesses also testified that Ms. Brown's behavior that night had been extremely irrational and violent. During her direct trial testimony, Ms. Brown attempted to corroborate her brother's version of the shooting, describing in detail how the crowd "attacked" her home. The prosecutor sought to determine if Ms. Brown was inebriated or drugged when she made these observations. The trial court did not abuse its discretion in ruling that there was ample evidentiary support for the prosecutor's questions. *See generally* McCormick, *Evidence* at 49, § 22 (Cleary ed. 1972).

■ Appellant next claims that defense witness James Hayes was improperly confronted on cross-examination with a prior statement inconsistent with his trial testimony. During his direct examination, Hayes testified that on the night of the shooting, an unidentified individual pointed a gun at him while he was attempting to mediate the dispute outside the Brown home. The prosecutor cross-examined Hayes with the statement he made immediately after the shooting that he had seen no one with a gun. This use of a prior inconsistent statement was well within the bounds of appropriate cross-examination. *Commonwealth v. Hamm*, 474 Pa. 487, 378 A.2d 1219 (1977).

■ Finally, appellant contends that in her closing argument the prosecutor improperly described the Sampson shooting as an "execution" and a "slaughter."[2] In evaluating similar misconduct claims, we have held that the allegedly improper comments must be read in their full context, including the defense closing. We may thus determine if the comments were made in fair response to defense argument. *Commonwealth v. Stoltzfus*, 462 Pa. 43, 337 A.2d 873 (1975); ABA Project on the Standards for Criminal Justice, *Standards Relating to the Prosecution Function*, § 5.8 (Approved Draft, March 1971) (commentary) ("[A] prosecutor may be justified in making a reply to an argument by defense counsel which may not have been proper if made without provocation.")[3]

2. Appellant fails to specify where in the record the words "slaughter" and "execution" appear. This is a serious oversight since we can determine if prosecutorial comments are prejudicial only by reviewing them in context. *See Commonwealth v. Van Cliff*, 483 Pa. 576, 397 A.2d 1173 (1979).

3. A substantial number of jurisdictions have adopted rules making it permissible for a prosecutor to respond in kind to an improper defense closing. *People v. McDaniel*, 16 Cal.3d 156, 127 Cal.Rptr. 467, 545 P.2d 843 (1976); *People v. Stock*, 56 Ill.2d 461, 309 N.E.2d 19 (1974); *Commonwealth v. MacDonald*, 368 Mass. 395, 333 N.E.2d 189 (1975); *State v. Bowden*, 113 R.I. 649, 324 A.2d 631 (1974); *cert. denied sub nom. Picard v. Rhode Island*, 419 U.S. 1109, 95 S.Ct. 782, 42 L.Ed.2d 805 (1975); *State v. Cydzick*, 60 Wisc.2d 683, 211 N.W.2d 421 (1973); *State v. Yancey*, 32 Wisc.2d 104, 145 N.W.2d 145 (1966); *United States v. Esposito*, 523 F.2d 242 (7th Cir. 1975), *cert. denied*

The defense argued below that because the police would not permanently calm the "mob" outside appellant's home, he was compelled to shoot over the crowd to protect his family and property and that Ms. Sampson was hit accidentally. During his closing, defense counsel repeatedly expressed personal opinions, made arguments not supported by the evidence, and indulged in appeals to sympathy, in an effort to belittle the Commonwealth's contrary theory that the killing was intentional.[4] Such tactics are improper. ABA Project on the Standards for Criminal Justice, *Standards Relating to the Defense Function*, §§ 7.8, 7.9 (Approved Draft, March 1971). in response, the prosecutor discussed the evidence which revealed that appellant told the police to leave his home so he would be free to implement his plan to shoot those persons involved in the dispute. The discussion included the following comments:

> You heard from officers' testimony that the police came multiple times to the corner of Newkirk and Master, to Newkirk Street, to 2814 West Master. Now what they were told? They were told that they weren't needed. They were told that they weren't called. Who told them this?

> The defendant told them this. Now, I ask you in the use of your common sense and your logic, the police in Philadelphia go four times, two times, three times to a street to offer what? To offer assistance? Each time to

425 U.S. 916, 96 S.Ct. 1517, 47 L.Ed.2d 768 (1975); *United States v. Lewis*, 423 F.2d 457 (8th Cir. 1970), *cert. denied* 400 U.S. 905, 91 S.Ct. 146, 27 L.Ed.2d 142 (1970); *United States v. Johnson*, 527 F.2d 1381 (D.C.Cir. 1976).

**4.** For instance, defense counsel labelled as "most absurd" and "just ridiculous," the critical testimony of a Commonwealth eyewitness that appellant's attack was unprovoked. At several points in his closing, defense counsel, without evidentiary support, assailed the "cunningness" of the prosecutor in concealing evidence that showed appellant acted in self-defense. In addition, defense counsel improperly urged the jury, when evaluating appellant's testimony, to put themselves in appellant's place. *Compare e. g., Commonwealth v. Cherry*, 474 Pa. 295, 378 A.2d 800 (1977) (improper for the prosecutor to ask the jury to put themselves in the victim's place when evaluating her testimony).

be told that they're not needed. Why? What was the reason behind it? Did the defendant say that? Did he have some plan of his own? Is it a system of vigilante self-style execution that we are dealing with here?

\* \* \* \* \* \*

[D]o you believe, instead, what the Commonwealth says, that the girl, after her mother had bought her a suit, was on her way to go to a party in West Philly, and when she left at 5:30, she was okay. She never made it off that corner, and the Atwell boy said that she had just gotten there a couple seconds when he saw her hit. And after she went down, there was more firing.

Now, is this an attempt to protect oneself, or is this a slaughter?

Significantly, unlike defense counsel, the prosecutor did not express her personal opinions, but posed two questions as part of her discussion of the evidence, which fully supported the inference drawn. Moreover, both counsel and the trial court repeatedly cautioned the jury that the arguments of counsel should not be considered as evidence. In these circumstances, we cannot conclude that the prosecutor's closing argument was improper or prejudicial. *See Commonwealth v. Van Cliff, supra; Commonwealth v. Cronin,* 464 Pa. 138, 346 A.2d 59 (1975)).[5]

## II.

■ Appellant next argues that the trial court erred in allowing twenty peremptory challenges to each side during jury selection. He notes that twenty challenges are allowed only in capital prosecutions and that seven challenges are permitted in noncapital trials. Act of October 7, 1976, P.L. 1089, No. 217, § 1,19 P.S. § 811a. The murder trial below began six days after the date of our decision in *Common-*

---

**5.** Appellant also alleges that the Commonwealth did not comply with *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) because it "did not provide the defense with exculpatory materials until well into the trial of the case." (Appellant's brief at 10). Appellant fails to identify any such "exculpatory material," however. Absent such a specific allegation, we will not consider the claim.

*wealth v. Moody*, 476 Pa. 223, 382 A.2d 442 (1977), *cert. denied*, 438 U.S. 914, 98 S.Ct. 3143, 57 L.Ed.2d 1160 (1978), wherein we invalidated the death penalty then in effect. Thus, the appellant argues that only seven peremptory challenges should have been allowed because murder was not a capital offense at the time of the trial. We disagree.

In its opinion, the trial court explains that "in the ensuing confusion over the consequences of the Supreme Court's action in . . . [*Moody*], it appeared to this Court that allowing too many rather than too few peremptory challenges was the course of action better designed to protect defendant's rights." (Trial court opinion at 7) [6] In the circumstances of this case, the trial court's cautious ruling was not an abuse of discretion. *See Commonwealth v. Torres*, 467 Pa. 39, 354 A.2d 539 (1976).

### III.

The appellant, who is black, further alleges that the prosecutor systematically excluded black persons from the jury, noting that all of the sixteen people peremptorily excluded by the prosecution were black. In his brief, counsel for appellant adds his personal observation that in the two years prior to the trial, he represented black defendants in five Philadelphia murder trials during which the prosecution used peremptory challenges in a discriminatory fashion.[7] The record here shows that one black person did in fact serve on the jury.

In *Commonwealth v. Martin*, 461 Pa. 289, 336 A.2d 290 (1975), we discussed the issue of racial discrimination in jury selection and adopted the approach taken by the United States Supreme Court in *Swain v. Alabama*, 380 U.S. 202, 222, 85 S.Ct. 824, 837, 13 L.Ed.2d 759, 773–74 (1965):

6. Indeed, the validity of the death penalty remained uncertain until July 3, 1978, when the United States Supreme Court denied the Commonwealth's petition for certiorari. *Pennsylvania v. Moody*, 438 U.S. 914, 98 S.Ct. 3143, 57 L.Ed.2d 1160 (1978).

7. Counsel has not supplied this Court with the docket numbers or any other citation to the cases referred to, but has provided only the surnames of the defendants.

In the light of the purpose of the peremptory system and the function it serves in a pluralistic society in connection with the institution of jury trial, we cannot hold that the Constitution requires an examination of the prosecutor's reasons for the exercise of his challenges in any given case. *The presumption in any particular case must be that the prosecutor is using the State's challenge to obtain a fair and impartial jury to try the case before the court. The presumption is not overcome and the prosecutor therefore subjected to examination by allegations that in the case at hand all Negroes were removed from the jury or that they were removed because they were Negroes.* Any other result, we think, would establish a rule wholly at odds with the peremptory challenge system as we know it.

\* \* \* \* \* \*

[The presumption is overcome] when the prosecutor in a county, in case after case, whatever the circumstances, whatever the crime and whoever the defendant or the victim may be, is responsible for the removal of Negroes who have been selected as qualified jurors by the jury commissioners and who have survived challenges for cause, with the result that no Negroes ever serve on petit juries . . .

(Emphasis in original.)

*Commonwealth v. Martin, supra,* 461 Pa. at 296–97, 336 A.2d at 294. We conclude that appellant has not met his "initial burden of demonstrating a *prima facie* case of discrimination." *Id.,* 461 Pa. at 296, 336 A.2d at 293.

### IV.

■ Finally, appellant contends that the trial court improperly denied his requested charges on self defense and burden of proof. Since objections on these points were not among those raised by appellant following the trial court's charge, they have been waived. Pa.R.Crim.P. 1119(b); *Commonwealth v. Martinez,* 475 Pa. 331, 337, 380 A.2d 747, 750 (1977) (plurality).

Judgments of sentence affirmed.

ROBERTS, J., filed a dissenting opinion.

NIX, J., filed a dissenting opinion.

NIX, Justice, dissenting.

The record in this case establishes that sixteen prospective jurors were excluded because of their race. The record also shows that the Commonwealth only exercised sixteen peremptory challenges. Nevertheless, the majority has seen fit to hold "that appellant has not met his 'initial burden of demonstrating a *prima facie* case of discrimination.'" *See* maj. opinion page 186, 187. This conclusion is based on the fact that one person of the racial group involved did in fact serve on the jury and further upon a reliance of the test initially set forth in *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), and adopted in this jurisdiction in *Commonwealth v. Martin*, 461 Pa. 289, 336 A.2d 290 (1975).

Writing in dissent in *Martin*, I expressed my disagreement with adoption of the *Swain* rule for this jurisdiction as follows:

"I respectfully dissent from that portion of the majority opinion which dismisses appellant's claim that he was denied a fair trial by reason of the Commonwealth's complete exclusion of Black jurors from the jury which tried him. Under the admitted facts, all of the prospective Black jurors who were members of the panel from which the petit jury which convicted appellant was selected were rejected. Two were excused for cause, the remaining eight members were challenged peremptorily by the Commonwealth.

The majority relied upon the presumption suggested by the Supreme Court of the United States in *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), to overcome this blatant discriminatory exclusion of Blacks from this jury and to foreclose the right of appellant to complain. The Supreme Court in *Swain* stated:

'The presumption in any particular case must be that the prosecutor is using the State's challenges to obtain a fair and impartial jury to try the case before the court.

The presumption is not overcome and the prosecutor therefore subjected to examination by allegations that in the case at hand all Negroes were removed from the jury or that they were removed because they were Negroes.' *Id.* at 222, 85 S.Ct. at 837.

In *Swain* the Court reasoned that the presumption is only overcome where the prosecutor *n case after case* is responsible for the removal of all Negroes from every jury. *Id.* at 223, 85 S.Ct. 824 [at 837].

Is justice to sit supinely by and be flouted in case after case before a remedy is available? Is justice only obtainable after repeated injustices are demonstrated? Is there any justification within the traditions of the Anglo-Saxon legal philosophy that permits the use of a presumption to hide the existence of an obvious fact?

Blackstone, in his Commentaries, says, 'The right of trial by jury, or the country, is a trial by the peers of every Englishman, and is the bulwark of his liberties, and is secured to him by the Great Charter.' In America, the right of trial by jury in this pluralistic society must at least mean trial by fellow citizens regardless of race.

'The very idea of a jury is a body of men composed of the peers or equals of the person whose rights it is selected or summoned to determine; that is, of his neighbors, fellows, associates, persons having the same legal status in society as that which he holds.' *Strauder v. West Virginia*, 100 U.S. 303, 308, 25 L.Ed. 664 (1880).

The glaring weakness in the *Swain* rationale is that it fails to offer any solution where the discriminatory use of peremptory challenges is made on a selected basis. In Northern communities systematic exclusion of an entire racial group from juries is rarely seen. More frequently, the problem arises in cases where the facts give rise to racial overtones and where an objective and unbiased jury is most needed. *Swain* provides no protection against this type of abuse. To the contrary, it facilitates its perpetuation.

While there is possible justification for the Supreme Court of the United States who must be concerned with the quality of justice throughout the nation to confine its attention to the most blatant examples of exclusion based on race in jury selection, a state should be more concerned with the particular kind of injustice that may be found within its borders. It must be remembered there is no constitutional right granted to the State to have peremptory challenges. It is, however, abundantly clear that both the Federal and the Pennsylvania Constitution guarantee the accused the right of trial by his peers. U.S. Const., Amend. VI; Pa.Const., Art. II, § 9. It would seem incumbent upon this Court to interpret our constitutional provision in such a manner that it meets the kind of injustices which are prevalent within this jurisdiction.

While I have great respect for the tradition of peremptory challenges, no tradition can be allowed to perpetrate injustice. Where, as here, it is apparent that the only available Black jurors were challenged peremptorily by the Commonwealth and the record of voir dire offers no basis for their rejection except race, it is, in my judgment, unreasonable to conclude that a presumption can justify a finding that the prosecutor's use of the challenge was only to obtain a fair and impartial jury. There is no justification for the use of a presumption to obscure fact. Its only legitimate evidentiary value is to assist in determining truth. Under the facts of this case, I believe the burden should be shifted to the prosecution to rebut the inference of improper exclusion of Black jurors. *Commonwealth v. Darden*, 441 Pa. 41, 51, 271 A.2d 257, 262 (1970).

I would remand the matter for a hearing to afford the Commonwealth an opportunity to explain the bases, other than race, for the peremptory challenges to the eight Black jurors."

The fact that this problem has repeated itself in this and other cases since our pronouncement in *Martin* bears further evidence of the ineffectiveness of the *Swain* test in preserving the fundamental principles of fair trial in this jurisdic-

tion. I again urge the majority of this Court to reconsider its position, and to frame a test that is more realistic and that will be more effective in ferreting out and rejecting this invidious type of racism which should have no place in a court proceeding in the Commonwealth of Pennsylvania.

ROBERTS, Justice, dissenting.

In the course of closing argument, the prosecutor asked the jury: "Is it a system of vigilante self-style execution that we are dealing with here? . . . Now, is this an attempt to protect oneself, or is this a slaughter?" Remarkably, the majority concludes that such argument is neither improper nor prejudicial. I must dissent.

The responsibilities of a prosecutor extend beyond the role of advocate. "The duty of the prosecutor is to seek justice, not merely to convict." ABA Standards Relating to The Prosecution Function § 1.1(c) (Approved Draft, 1971); see Code of Professional Responsibility EC 7–13. "Although the prosecutor operates within the advocacy system, it is fundamental that his obligation is to protect the innocent as well as to convict the guilty, to guard the rights of the accused as well as to enforce the rights of the public." ABA Standards Relating to The Prosecution Function, supra, Commentary to § 1.1. This special responsibility arises from three considerations:

"(1) the prosecutor represents the sovereign and therefore should use restraint in the discretionary exercise of governmental powers, such as in the selection of cases to prosecute; (2) during trial the prosecutor is not only an advocate but he also may make decisions normally made by an individual client, and those affecting the public interest should be fair to all; and (3) in our system of criminal justice the accused is to be given the benefit of all reasonable doubts."

Code of Professional Responsibility EC 7–13. As the United States Supreme Court explained, the prosecutor

"is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to

govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."

*Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935).

A prosecutor's closing argument is of particular concern because of the possibility that the jury will give it "special weight" in light of the prosecutor's prestige and superior factfinding facilities. See ABA Standards Relating to The Prosecution Function, supra, Commentary to § 5.8.

"It is fair to say that the average jury, in a greater or less degree, has confidence that [a prosecutor's special duties] . . ., which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations, and especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none."

*Berger v. United States*, supra at 88, 55 S.Ct. at 633. Consequently, the ABA has set forth express and specific limitations on prosecutorial argument to the jury:

"(a) The prosecutor may argue all reasonable inferences from evidence in the record. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

(b) It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.

576

(c) The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury.

(d) The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict."

ABA Standard Relating to The Prosecution Function, supra, § 5.8.

In applying these limitations, this Court has held that a prosecuting attorney may not indulge in personal assertions of guilt of the accused either by direct statement or indirectly by figure of speech. See *Commonwealth v. Van Cliff*, 483 Pa. 576, 586, 397 A.2d 1173, 1178 (1979); *Commonwealth v. Cronin*, 464 Pa. 138, 143, 346 A.2d 59, 62 (1975). Nor may a prosecutor unfairly characterize or stigmatize the accused. See *Commonwealth v. Gilman*, 470 Pa. 179, 368 A.2d 253 (1977) (prosecutor called defendant "cold-blooded killer" and characterized him as "sly, calculating and deceiving"); *Commonwealth v. Lipscomb*, 455 Pa. 525, 317 A.2d 205 (1974) (prosecutor called defendant a "hoodlum" and "Criminal"); *Commonwealth v. Capalla*, 322 Pa. 200, 185 A. 203 (1936) (prosecutor called defendant a "cold-blooded killer"). Surely the prosecutor's reference in this case to "vigilante self-style execution" and "slaughter" with respect to appellant is as unduly inflammatory and prejudicial to appellant as the prosecutorial comments in the cases noted above.

The majority attempts to justify these references by speaking of them as mere "questions," bereft of the prosecutor's personal opinion. Such justification by the majority is disingenuous. It is perfectly clear that these "questions" were rhetorical attempts by the prosecutor to characterize appellant in a highly inflammatory and impassioned fashion.

The majority also suggests that the prosecutor's comments are to be excused as a "fair response" to what the majority terms as defense counsel's intemperate closing argument. Unlike the majority, I am unwilling to permit the prosecu-

tion to resort to any self-help remedies. Rather we must rely, as we have always done, upon the trial judge to ensure a fair trial. The ABA Standards Relating to The Function of the Trial judge (Approved Draft, 1972) provide in relevant part that the "trial judge has the responsibility for safeguarding both the rights of the accused and the interests of the public in the administration of criminal justice. . . . The trial judge should require that every proceeding before him be conducted with unhurried and quiet dignity . . ." § 1.1(a) & (b). It is manifest that the trial judge not allow the adversary process to

"become a mere game, but [rather to control it] . . . to the extent needed to make our courts 'swift and certain agents of justice.' . . . [I]t is the proper role and function of the trial judge to exercise his judicial powers in such a manner as to give the jury opportunity to hear the case free from irrelevant issues and appeals to passion and prejudice. . . . [I]t is ultimately the authority and responsibility of the trial judge to maintain the atmosphere appropriate for a fair, rational and civilized determination of the issues, and to govern the conduct of all persons in the courtroom, including the attorneys."

ABA Standard Relating to The Function of the Trial Judge, supra, Comment to § 1.1. Thus it is clear that the only permissible remedy available to the prosecutor for defense counsel's closing remarks was to request judicial correction.

The doctrine of "fair response" is a secondary means of redress, intended only to provide the prosecutor an opportunity to respond to defense counsel's injection of extraneous issues. See ABA Standards Relating to The Prosecution Function, supra, Comment to § 5.8(d); accord ABA Standards Relating to The Trial Judge Function § 5.10 (final argument to the jury). This doctrine, however, does not and cannot give prosecutors license to engage in misconduct. As the ABA Standards' discussion of "fair response" makes clear, the "better solution to this problem lies in having advocates adequately instructed as to the limits of proper argument and trial judges willing to enforce fair rules as to

such limits." Id. Prosecutorial misconduct thus cannot be excused here.

Accordingly, I would grant appellant a new trial.