587 A.2d 792

COMMONWEALTH of Pennsylvania, Appellee,

v.

William C. MacBRIDE, Appellant.

Superior Court of Pennsylvania.

Argued Oct. 18, 1990.

Filed March 15, 1991.

S. Lee Ruslander, West Chester, for appellant.

Nicholas J. Casenta, Jr., Asst. Dist. Atty., Downingtown, for Com.

Before DEL SOLE, POPOVICH and BROSKY, JJ.

POPOVICH, Judge:

This is an appeal from judgment of sentence of the Court of Common Pleas, Chester County, where defendant was convicted by a jury on three counts of both simple assault and recklessly endangering another person. *See* 18 Pa.C. S.A. §§ 2701(a)(3) & 2705 (Purdon 1983). We reverse and remand for a new trial.

The facts of this case are as unusual as they were hotly contested by the parties at trial below. On the morning of Sunday, June 7, 1987, three individuals took to flight in a hot-air-balloon, their path, dictated by wind, leading them directly over defendant's residential property in Chester County, Pennsylvania. Defendant owned both a dog and a horse and was not unaccustomed to the sight of hot-air-balloons floating overhead nor with the terrified reaction displayed by his two animals when such occurred. As the balloons drew near, increased anxiety regularly required defendant to stow his horse in its stall. N.T. 3/14/88 at 79–82. On this particular morning, defendant was awakened by his wife who informed him that a balloon had passed over their barn. Defendant proceeded outside and spotted a balloon through the woods adjoining his property. The horse was noticeably "very excited[:] snorting, banging against the bars, so on ... [the] dog was totally a basket case." N.T. 3/14/88 at 79. At this point defendant took a twelve-gauge shotgun and two shells from his house. Positioned on his porch, and, according to defendant, in an effort to attract the balloonists' attention, he fired one shot from his hip at "right angles to the balloon" into honeysuckle and small trees fifty feet away. "The shot [was] on my property [said defendant,] ... [i]t was never more than, oh, waist high from the ground." N.T. 3/14/88 at 80, 86.

Defendant testified that "[he] had been hollering at these balloons for four years" but was unable to get them to listen or look down. Thus, defendant testified that it was through use of the shotgun that he intended *not* to frighten the balloonists, but rather only to draw their attention. "[M]y intent was to get them to look down so I could tell them to go over my property at a respectable altitude so as not to harm my animals." N.T. 3/14/88 at 82, 84–5. Defendant recalls the approximate height of the balloon as being seventy-five feet as it passed over his property and also recalls having motioned with the gun for them to gain altitude. N.T. 3/14/88 at 82–3. At the close of the incident one of the balloonists, Mr. Supplee, was heard to

say: "all right, all right, we're leaving." He then proceded to switch the burners on high speed for maximum climb rate. N.T. 3/14/88 at 51, 26.

The incident is recounted somewhat differently by the passengers in the balloon. Mr. Supplee, a commercial pilot and owner of the balloon testified, first, that he had been preparing to land as the balloon passed over defendant's property at a height of approximately 180 feet and at a distance of roughly 180 feet from defendant's residence. N.T. 3/14/88 at 23, 31. He recalls the incident as follows:

> [W]e saw someone come out of the house and point something up in the air, which at first we thought it was a stick. Then it was *pointed in our general direct.* [sic]
>
> All of a sudden there was a shotgun blast. We could see the wads coming out of the shell *directly on our flight path,* a *little bit higher* than we were and a *little bit ahead* of us.
>
> .    .    .    .    .
>
> We watched. We could see the gun being reloaded. And a few seconds later another blast. *This one was somewhat closer....* On the second blast we also could *see these wads coming toward us.*
>
> .    .    .    .    .
>
> After the second shot, I yelled, all right, all right; let's get out of here, or something to that effect.
>
> I was in deadly *fear a third shot would be aimed directly at us.* If one of those bullet [sic] ever hit the propane system, we would immediately become a fireball. All of us would be killed. The balloon would be blasted out of the sky.

N.T. 3/14/88 at 23, 26 (emphasis added). Significantly, Mr. Supplee testified on redirect that: "No, I never said that he shot directly at us." N.T. 3/14/88 at 43. Nonetheless, the other balloonists testified to a like fear for their welfare. Mr. Redmond stated:

"I was a little bit frightened considering the fact that we had all that propane on board. It's like a bomb, if it ever went off."

Ms. Kahn stated:

I was terrified. I was so shocked that for the first shot I couldn't believe that it was happening. It was sort of like this is—I could just could not believe it was happening. The second shot I believed it.

N.T. 3/14/88 at 48, 51.

The jury returned a verdict of guilty on each of six counts, three charging simple assault (one for each balloonist/victim), and three charging recklessly endangering another person (same). *See* 18 Pa.C.S.A. §§ 2701(a)(3) & 2705 (Purdon 1983). Defendant's trial counsel, Mr. Kalmbach, timely filed post-trial motions which ultimately were dismissed for failure to file a supporting brief. Defendant, thereafter, and acting. *pro se,* filed motions in arrest of judgment and for a new trial. New counsel, Mr. Ruslander, filed supplemental post-trial motions on defendant's behalf. Post-trial briefs were also filed and a hearing was held on March 10, 1989. Eventually, defendant's post-trial motions were denied and, on February 13, 1990, defendant was sentenced to two years probation and fined $350.00 plus the costs of prosecution. Sentence also included 200 hours of community services. On appeal, defendant makes numerous allegations of error; we need only address two for purposes of reversal.

■ Defendant first alleges that defense counsel was ineffective for failing to object contemporaneously to various remarks made by the prosecutor during closing arguments. Secondly, it is contended that the trial court erred for failure to grant a requested motion for mistrial by defense counsel.

Appellant's claims must be considered against our supreme court's recent expression of the limits placed on commentary by counsel:

[N]ot every intemperate remark or uncalled for remark by the prosecutor requires a new trial. As we have stated many times:

> [C]omments by a prosecutor do not constitute reversible error unless the "unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so that they could not weigh the evidence objectively and render a true verdict." [citations omitted].

*Commonwealth v. Yabor*, 376 Pa.Super. 356, 546 A.2d 67 (1988) (citing *Commonwealth v. Carpenter*, 511 Pa. 429, 439, 515 A.2d 531 (1986)). Furthermore, prosecutorial commentary will not be considered in isolation; rather, it must be evaluated in the context in which it occurs. *See Commonwealth v. Smith*, 490 Pa. 380, 388, 416 A.2d 986, 989 (1980). Accordingly, we consider the following statements by the prosecutor:

> They all said why they were afraid. But [defense counsel] says, well, they didn't mention propane.
>
> .   .   .   .   .
>
> The police officer says, write down what happened. Some *nut* firing a gun at me in a balloon. You're not going to say, a balloon, made out of liquid propane tanks, hoses going up in this different area. No they are going to give a one page summary of what happened.
>
> .   .   .   .   .
>
> Let's discuss recklessly endangering.
>
> .   .   .   .   .
>
> The law says its disregard involves a gross deviation from the standard of care that a reasonable person would observe in the defendant's situation. So if you have, pardon the expression, but if you have a *nut* firing a gun, you don't say, well, he's a *nut*, we forgive him for that. You look at what a reasonable person does.
>
> .   .   .   .   .
>
> We have a standard of conduct in this society, also property rights. People can fly over your property—

ARCO Go Patrol helicopter, police helicopters, Action News, planes, whatever, helicopters. Let's take this example. Landowner A has a heart attack, falls down on his property, is rushed to the hospital, Southern Chester County Medical Center. They can't take care of him. They don't have adequate facilities. What do they do? They put him in a helicopter, fly him down to Philadelphia. They are cruising along. *They make a big mistake, they cross over enemy lines, [defendant's property]. His dog starts going crazy because it's a helicopter. He gets the gun out—*

[Defense counsel:] Objection. I do apologize but—

[The Court:] The objection is sustained.

N.T. 3/15/88 at 125–26, 133–34, 137 (emphasis added).

Defense counsel offered no contemporaneous objection(s) to the above-quoted first two excerpts. Nonetheless, at side-bar, and after closing arguments, defense objected and moved for a mistrial based upon the impropriety of the prosecutor's continual inferences that defendant was a "nut" and a "liar." N.T. 3/15/88 at 139. Both the objection and motion for mistrial were denied at trial and at post-trial review.

■ Appellant's claimed ineffectiveness for failing to object can be dispensed with summarily. Objection, although not contemporaneous, occurred on the record and immediately subsequent to the prosecutor's closing statements. Moreover, counsel's objection was sufficiently specific—and its basis in the record undisputed—to apprise the trial judge of the matters complained of and to afford the opportunity for correction in the jury charge. *See Commonwealth v. Adkins*, 468 Pa. 465, 364 A.2d 287 (1976) (timeliness must be assessed in light of the purposes served by the rule; where objection is delayed, yet properly recorded, and where its basis in the record uncontested, then belated objection may be considered timely); *see also Commonwealth v. Perkins*, 473 Pa. 116, 373 A.2d 1076 n. 10 (1977). Accordingly, we hold that defense counsel's objection to the above-cited remarks was timely and that appellant's ineffec-

tiveness claim lacks arguable merit. *See Commonwealth v. Durst*, 522 Pa. 2, 559 A.2d 504 (1989) (threshold inquiry in ineffectiveness claim is whether issue/argument/tactic which counsel has foregone and which forms the basis for the assertion of ineffectiveness is of arguable merit).

Ineffectiveness notwithstanding, appellant asserts error in the denial of defense counsel's motion for mistrial based upon the alleged impropriety of the prosecutor's closing argument.[1] Appellant contends that "the [above-cited] references impugned the character and reputation of the defendant and appealed to the emotions of the jurors ... [whereby producing] a verdict based upon emotion or passion rather than the evidence presented." Appellant's Brief at 52. In defense, appellee suggests that in neither passage does counsel directly comment on the defendant or refer to defendant as a "nut." Appellee's Brief at 34, 36–7.

Technically, perhaps appellee is correct. In the first passage the prosecution takes the perspective of how *the victims* hypothetically might have responded to a police request for a statement. Similarly, in the second instance,[2] the prosecutor would appear to be explaining the reasonable person standard and, in so doing, makes the point that the personal idiosyncrasies of *any and all defendants* are irrelevant to this, an objective test of reasonableness. *Cf. Commonwealth v. Barren*, 501 Pa. 493, 462 A.2d 233, 234 (1983) (prosecutorial remarks tending not to implicate directly the defendant not sufficiently prejudicial to support

1. Preliminarily, we find counsel's motion timely and made in accordance with Pa.R.Crim.P. 1118(b) which provides:
   When an event prejudicial to the defendant occurs during trial only the defendant may move for a mistrial; *the motion shall be made when the event is disclosed.*
   (emphasis added). A fair reading of the rule suggests that objection is timely where, as here, that which is objectionable occurs in the prosecutor's closing argument and defense counsel moves for mistrial immediately subsequent thereto.

2. Judge Gavin does not pass on the above-cited second remark on grounds of waiver by defense counsel for failure to specify the point in controversy. *See* Pa.R.A.P. 2117(a)(4). We agree with appellant and find specific reference made to the claimed offensive language in appellant's supplemental post-trial brief. Filed 6/2/89 at 11.

new trial). Nevertheless, our task on review is not one confined solely to an exercise in semantics. Rather, we must consider the practical effect of the statements on the jurors' ability to render an objective verdict.

These statements clearly can be taken to insinuate questionable if not a disturbed character. Nevertheless, according to the trial judge, they were "fair comment for describing the conduct of one who would fire a shotgun at a balloon which had transgressed solely by violating one's airspace." Trial Op. at 20. We will review this conclusion in light of our oft-repeated standard of prosecutorial commentary; namely, that a prosecutor must confine his/her argument to facts in evidence and legitimate inferences therefrom. *See, e.g., Commonwealth v. Shain,* 493 Pa. 360, 426 A.2d 589 (1981); *Commonwealth v. Starks,* 479 Pa. 51, 387 A.2d 829 (1978); *Commonwealth v. Revty,* 448 Pa. 512, 516, 295 A.2d 300, 302 (1972); *see generally* ABA Standards, The Prosecution Function, Section 5.8 (1971). As a corollary to this proposition, so too have we denounced statements of personal opinion offered by the prosecutor suggesting defendant's guilt or otherwise stigmatizing a defendant through use of epithets. *See, e.g., Commonwealth v. Anderson,* 490 Pa. 225, 415 A.2d 887 (1980) (reference by prosecutor to defendant as an "executioner" involved in an "assassination" because the victim had "violated some code"); *Commonwealth v. Capalla,* 322 Pa. 200, 204, 185 A. 203, 205 (1936) (characterization of defendant as a "cold-blooded killer"); *Commonwealth v. Baranyai,* 296 Pa.Super. 342, 442 A.2d 800 (1982) (characterization of defendant as a "punk behind a badge," a "Buford Pusser," and a "Clint Eastwood" who used "Gestapo tactics"); *Commonwealth v. Smith,* 478 Pa. 76, 385 A.2d 1320 (1978) (prosecutorial characterization of defendant as a "vicious desperate killer who would kill for a nickel in this struggle"). Measured against these standards, we find the record devoid of evidence from which the jury could infer

that defendant was a "nut" [3] and, further, find use of this language stigmatizing.

We are not presented herein with an unexplained assault on the balloonists or an attempt to terrorize or do physical violence to them.[4] Although we do not condone defendant's use of force, the evidence is uncontradicted in that it supports an intent to draw the balloonists attention, perhaps even to frighten them, and to have them fly at a greater altitude while passing over defendant's property. At most, the jury could draw the inference that defendant was a frustrated and, perhaps, reckless landowner who had been bothered by hot-air-balloons for years through the disruption caused to his animals. But to characterize defendant as a "nut" suggests more than reckless behavior because it insinuates that defendant is a mindless and dangerous individual who had no reason whatsoever for his conduct. Clearly, this inference is belied by the record which shows a landowner motivated by the rather unremarkable desire to protect his property. Accordingly, we find that the prosecutor improperly expressed his personal opinion of defendant's character—and, indirectly, defendant's guilt or propensity to act recklessly, *cf. Commonwealth v. Williams*, 470 Pa. 172, 368 A.2d 249 (1977) (predisposition commentary by prosecution improper)—and thereby asked the jury to draw deductions both unwarranted by the evidence, *see, e.g. Shain, supra*, and stigmatizing in nature. *See, e.g. Smith, supra.*

In the context of reviewing the denial of a motion for mistrial, once we conclude that the prosecutor's commentary was improper we then ask whether the adverse ruling was marked by a flagrant abuse of discretion, *i.e.*, whether

3. Taken in context, it is apparent that the prosecution used the term "nut" in its current vernacular to mean insane or unbalanced in mind. *See* Webster's Third New International Dictionary 1552 (1976) ("nut ... 8 b ... one who is or seems to be mentally unbalanced").

4. The jury was *not* instructed as to the crime of aggravated assault, *see* 18 Pa.C.S.A. § 2702 (Purdon 1983), and properly so; for if defendant had intended to do physical violence to the balloonists, he clearly had the opportunity to do so. Specifically, defendant noted that a blind man could have hit the balloon using a shotgun. N.T. 3/14/88 at 84.

the occurrence was so prejudicial as to deprive defendant of a fair and impartial trial. *See Commonwealth v. Potts*, 314 Pa.Super. 256, 460 A.2d 1127 (1983). We also must remain mindful that not every intemperate, uncalled for and improper remark made by the prosecutor demands a new trial. *See Commonwealth v. Stoltzfus*, 462 Pa. 43, 337 A.2d 873 (1975); *see also Yabor, supra.*

Instantly, and viewed as a whole, *see Smith*, 490 Pa. 380, 388, 416 A.2d 986, 989, the record discloses not one isolated, albeit indirect, reference to defendant as a "nut," but three repetitions of the same derogatory language. To compound matters, the prosecutor, speaking metaphorically, insinuated that defendant was so crazed as to shoot at a medical helicopter flying over his land. The intendiment is clear— the prosecution sought to portray defendant as a present and continual menace to society insofar as reckless conduct might become, or is, perhaps, the norm. The cumulative effect of this line of argument produced a highly prejudicial atmosphere at the close of trial. The remarks served no legitimate purpose and can be seen as merely a plea to inflame the passions and prejudices of the jury. *See, e.g., Anderson, Capalla, Baranyai,* and *Smith, supra.* Without a cautionary instruction or other circumstances militating against the prejudicial atmosphere at trial, the necessary and unavoidable result was an inherently unreliable verdict. Furthermore, we cannot say that the evidence establishing guilt was so overwhelming as to render the prejudicial effect of the prosecutorial misconduct harmless. *See Commonwealth v. Story,* 476 Pa. 391, 383 A.2d 155, 166 (1978). As such, defendant has been denied his right to a fair trial.

Judgment of sentence is reversed and a new trial is ordered.

BROSKY, J., files a concurring opinion.

BROSKY, Judge, concurring.

I concur with the majority's conclusion that the case must be remanded for a new trial; however, I rely upon a

different challenge made by appellant than the one relied upon by the majority. During cross-examination of one of the investigating officers, the officer commented that appellant refused to talk to him after he had been read his Miranda rights. A short time later the officer again indicated that appellant refused to answer any questions at the station. It has been established that evidence of one's silence or refusal to answer questions is reversible error. *Commonwealth v. Haideman,* 449 Pa. 367, 296 A.2d 765 (1972), *Commonwealth v. Greco,* 465 Pa. 400, 350 A.2d 826 (1976). However, trial counsel made no objection at time of trial to what would appear to be objectionable references to appellant's invocation of his Fifth Amendment right of silence. Appellant now claims ineffectiveness of counsel.

In a post-trial hearing appellant's trial counsel indicated that the crux of appellant's defense was that he had fired a warning shot parallel to the ground and not in the direction of the balloon. The prosecution's version of the events was quite to the contrary and the case clearly hinged upon a question of which version to accept. Appellant's trial counsel also indicated that they were trying to bolster appellant's defense by establishing his willingness to cooperate with the police. Counsel offered no recollection of the exact reason he did not object to the police officer's testimony but stated that he usually would not ask for a curative instruction if he felt that it would highlight the offending testimony. In light of the above precedent I believe the remarks of the officer were objectionable and a sound basis for the granting of a new trial. Thus, I believe that the failure to object constitutes ineffective assistance of counsel.

To the extent the case hinged naturally upon an adoption of one of a competing version of the events, and credibility was of paramount importance, the testimony offered by the police officer was very prejudicial to appellant's defense. It could have led the jury to believe that appellant was not being completely honest with the officers or that he was withholding pertinent facts. The potential influence upon

636

the jury seems obvious. Thus, I too believe appellant is entitled to a new trial.